# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

MICHAEL HEIDBREDER )
        )
     Plaintiff, )
        )   Case No.:
    vs )
        )
EPIC GAMES, INC., )
        )
     Defendant. )   **CLASS ACTION COMPLAINT**
        )   JURY TRIAL DEMANDED
        )

# TABLE OF CONTENTS

SUMMARY OF CASE ........................................................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 3

PARTIES ........................................................................................................................... 3

    A.    Plaintiff ............................................................................................................ 3

    B.    Defendant ........................................................................................................ 4

FACTUAL BACKGROUND ............................................................................................ 4

    A.    Epic Games Collects and Stores PII for its Own Financial Gain ............. 4

    B.    PII Is Very Valuable on the Black Market ............................................... 7

    C.    Epic Games' Inadequate Data Security Allowed the Breach of Fortnite User Accounts ...................................................................................... 10

CLAIMS ALLEGED ON BEHALF OF ALL CLASSES .......................................... 15

    First Claim for Relief ........................................................................................ 15

    Second Claim for Relief .................................................................................... 17

    Third Claim for Relief ...................................................................................... 18

    Fourth Claim for Relief .................................................................................... 20

ADDITIONAL CLAIM ALLEGED ON BEHALF OF THE MISSOURI SUB-CLASS ONLY .............................................................................................................. 21

    Fifth Claim for Relief ........................................................................................ 21

PRAYER FOR RELIEF ............................................................................. 23

JURY TRIAL DEMANDED ...................................................................... 24

ii

For his Class Action Complaint, Plaintiff Michael Heidbreder ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following against Defendant Epic Games, Inc. ("Defendant" or "Epic Games"), based on personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's undersigned counsel:

## SUMMARY OF CASE

1.      This case involves a data breach Epic Games announced on January 16, 2019, wherein the personal information of 200 million Fortnite users was exposed due to a flaw in Fortnite's code that allowed hackers and other nefarious users to take over player accounts and exploit their personal information for unsavory and illegal purposes ("Data Breach").

2.      Epic Games developed and operates Fortnite, a popular battle-royale style video game played by approximately 80 million people per month and with approximately 200 million registered users across computer, console, and mobile platforms.

3.      As part of the sign-up process and as a consequence of playing Fortnite, users create, maintain, and update accounts containing personal information, including their names, email addresses, and credit or debit card information, referred to herein as "PII" (personally identifiable information).

4.      On January 16, 2019, Epic Games publicly acknowledged that Fortnite users' PII was subject to a security breach, but did not disclose a timeframe for the Data Breach or how many accounts were impacted. Epic Games has not yet directly informed or notified individual Fortnite users that their PII may be compromised as a result of the breach. Epic Games' acknowledgement only came after Check Point Software Technologies Ltd. ("Check Point"), a cybersecurity firm, discovered vulnerabilities in Fortnite's web infrastructure and disclosed their findings to Epic Games in November of 2018.

5.      Fortnite's vulnerabilities stemmed from its single sign-on ("SSO") setup, a mechanism that allows users to log into multiple services with the same third-party account such

as Epic Games, Xbox, or Google. Once logged into a third-party account, users could log in and access their Fortnite account by requesting the third-party account send an access token[1] to Fortnite.

6.      Hackers exploited the SSO by distributing phishing links over social media messages or forum posts claiming, *inter alia*, to be about a Fortnite promotion. When users opened the link, they were asked to log in to their Fortnite account via the SSO. But instead of having the third-party account send the security token to the legitimate login, hackers redirected those users to an old, unsecured URL maintained by Epic Games. Check Point's research revealed that hackers could embed that URL with malicious JavaScript allowing them to steal Fortnite access tokens which they could then use to take over users' accounts.

7.      As a result of Defendant's failure to maintain adequate security measures and notify users of the security breach in a timely manner, Plaintiff and certain Fortnite users' PII was compromised. They have suffered an ascertainable loss in that the credit or debit card information linked to their Fortnite accounts was stolen as a result of Defendant's failures. Hackers used this information to purchase in-game Fortnite currency without the permission of the account holders, including Plaintiff. Hackers also used this information to steal player accounts. Some of these stolen accounts, once loaded up with in-game currency purchased fraudulently, were sold on third-party websites. The sale of Fortnite accounts on the dark web has increased recently,[2] with accounts selling for an average of approximately $11.29.[3] Furthermore, Plaintiff and the other impacted Fortnite users must undertake additional security measures, some at their own expense, to minimize the risk of

---

[1]      Access tokens are the equivalent of digital keys that allow users logged into third-party accounts to use those accounts as a verification to log in to their Fortnite accounts.

[2]      Antony Cuthbertson, Fortnite, Netflix and Uber Accounts Being Sold For Just £8 on the Dark Web (Feb. 19, 2019), *available at* https://www.independent.co.uk/life-style/gadgets-and-tech/news/fortnite-account-sale-dark-web-price-index-netflix-uber-cyber-crime-a8786686.html (last visited August 8, 2019).

[3]      Simon Migliano, Dark Web Market Price Index (February 2019 - UK Edition), *available at* https://www.top10vpn.com/privacy-central/privacy/dark-web-market-price-index-2019-uk-edition/#indextop (last visited August 8, 2019).

future data breaches including, without limitation, canceling credit or debit cards associated with their Fortnite and/or Epic Games accounts and changing their passwords to those accounts. But there is no guarantee that such security measures will in fact adequately protect their PII. As such, Plaintiff and the other Class members have an ongoing interest in ensuring that their PII is protected from past and future cybersecurity threats.

8.     This Class Action Complaint is filed on behalf of all persons in the United States described more fully in the following sections, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and at least one class member is a citizen of a state different from Defendant and is a citizen of a foreign state. The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(c) because Defendant is a corporation that does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including the decisions made by Epic Games' governance and management personnel that led to the Data Breach. Further, Epic Games' terms of service governing users in the United States provides for venue in North Carolina for all claims arising out of Plaintiff's relationship with Epic Games.

## PARTIES

A.     **Plaintiff**

11.     Plaintiff Michael Heidbreder is an adult individual residing in the State of Missouri.

12.     At all relevant times, Plaintiff had an Epic Games account, was a Fortnite user, and had a debit card linked to his Epic Games account.

**B.**     **Defendant**

13.     Defendant Epic Games, Inc. is a Maryland corporation with its principal executive offices located at 620 Crossroads Boulevard, Cary, North Carolina 27518.

14.     At all relevant times, Defendant was and is engaged in the business of developing and operating video games, websites, and mobile applications in Wake County and throughout the United States of America.

## FACTUAL BACKGROUND

**A.**     **Epic Games Collects and Stores PII for its Own Financial Gain**

15.     The majority of Epic Games' revenue comes from sales associated with its Fortnite video game. In 2018, Fortnite accounted for $2.4 billion of Epic Games' revenue, "'the most annual revenue of any [video] game in history.'"[4]

16.     While Fortnite's "Battle Royale" mode can be downloaded and played for free, users have the option of purchasing a "Battle Pass" each "Season" that allows access to exclusive in-game content for Battle Royale mode. Users can also purchase "PVE [player versus environment] Campaign Packs" ranging in price from approximately $40.00 to $150.00.

17.     To purchase in-game content, Fortnite users must add a credit or debit card to their account. This card information is then stored under the supervision and care of Epic Games.

18.     Regardless of whether a user purchases in-game content, they are still required to provide PII, including their full name and a valid email address.

19.     Despite the fact that the majority of Epic Games' revenue comes from charges to credit and debit cards under its protection, on information and belief, Defendant failed, and continues to fail, to provide adequate protection for Fortnite users' personal and confidential information and has egregiously failed to provide sufficient and timely notice or warning of potential and actual cybersecurity breaches to Fortnite users.

---

[4]     Matthew Handrahan, Fortnite tops SuperData's 2018 chart with $2.4 billion digital revenue (Jan. 16, 2019), *available at* https://www.gamesindustry.biz/articles/2019-01-16-fortnite-tops-2018-superdata-chart-with-usd2-4b-digital-revenue (last visited August 8, 2019).

20.     Upon information and belief, information as to whose accounts were exposed and whose PII was accessed without authorization as a result of the Data Breach is within Epic Games' exclusive control. Epic Games knows where accounts were logged-in from, where access tokens originated from and were sent, what type of device was used to log in to accounts, and what activity, fraudulent or otherwise, occurred on accounts.

21.     At all relevant times, Epic Games has assured Fortnite users that their privacy and security are of utmost importance to it, and Fortnite users have relied on those assurances in providing Epic Games with their PII. In fact, under a section of Epic Games' privacy policy entitled "How We Protect Personal Information," Epic Games provides that:

> We maintain appropriate administrative, technical, and physical safeguards to protect your personal information from accidental, unlawful, or unauthorized destruction, loss, alteration, access, disclosure, or use and other unlawful forms of processing. In some cases, your information is accessible when you log into a feature we offer, and in those cases you need to keep your user credentials and password confidential and secure so that your information is protected.[5]

22.     Epic Games failed to provide the security it promised to Fortnite users prior to the Data Breach, including that it "maintain[ed] appropriate administrative, technical, and physical safeguards to protect your personal information from accidental, unlawful, or unauthorized destruction, loss, alteration, access, disclosure, or use and other unlawful forms of processing."

23.     Despite these assurances, Epic Games was forced to publicly reveal on January 16, 2019 that Fortnite users' personal information was subject to a data breach. According to media outlet reports, Check Point informed Defendant of the vulnerabilities in Fortnite's web infrastructure as early as November of 2018,[6] but Defendant still has not yet directly informed or

---

[5]     Epic Games Global Privacy Policy (last updated Dec. 19, 2018), *available at* https://www.epicgames.com/site/en-US/privacypolicy (last visited August 8, 2019).

[6]     Jonathan Vanian, Researchers Discover Big Cybersecurity Flaw in Fortnite (Jan. 16, 2019), *available at* http://fortune.com/2019/01/16/fortnite-security-flaw-checkpoint/ (last visited August 8, 2019); Lily Hay Newman, A *Fortnite* Vulnerability Exposed Accounts to Takeover (Jan. 16, 2019), *available at* https://www.wired.com/story/fortnite-vulnerability-account-takeover/ (last visited August 8, 2019).

notified Fortnite users that their PII may have been and may continue to be compromised as a result of the Data Breach. Nor has Defendant disclosed when the vulnerability in Fortnite's code was introduced, how long hackers have had access to Fortnite users' PII, or how many user accounts were affected by the Data Breach.

24. The insufficient security policies and procedures implemented by Defendant is a material fact that a reasonable consumer would consider when deciding whether to create an Epic Games or Fortnite account and to provide Defendant with personal and confidential information. Had Plaintiff and the other Class members known that Defendant failed to employ necessary and adequate protection of their personal information, they would not have created an Epic Games or Fortnite account, or they would have limited the PII they shared with Epic Games. Plaintiff and the other Class members should have been able to rely upon Epic Games' Privacy Policy ensuring that "We maintain appropriate administrative, technical, and physical safeguards to protect your personal information from accidental, unlawful, or unauthorized destruction, loss, alteration, access, disclosure, or use and other unlawful forms of processing."[7]

25. This case involves the continuing and absolute disregard with which Defendant has chosen to treat the PII of account holders who played Fortnite. While this information was supposed to be protected, Epic Games – without authorization – exposed that information to third parties through lax and non-existent data safety and security policies and protocols.

26. In addition, Epic Games made the following representations to Fortnite users:

- "We are required to seek your consent before we use your personal information for any purpose incompatible with the purposes identified in this policy."[8]

- "We provide you with choices about whether to provide us with personal information and whether it is shared."[9]

---

[7] Epic Games Global Privacy Policy (last updated Dec. 19, 2018), *available at* https://www.epicgames.com/site/en-US/privacypolicy (last visited August 8, 2019).

[8] *Id.*

[9] *Id.*

27.     At all relevant times, Epic Games has maintained a Privacy Policy on its website which advised Fortnite users, in part:

> As a general matter, we use your information to provide the services, experiences, merchandise, or information you request. ***We also may use your information for the following purposes***.

> 1. For our legitimate interests, consistent with your rights and preferences, we use personal data:
>
>    - To communicate with you, respond to your requests, or provide you with updates and information;
>
>    - To better understand our users, their interests, and their preferences;
>
>    - To personalize your experience, save your preferences, authenticate our users, and provide similar user-experience features;
>
>    - To develop, deliver, and improve our products, services, and other offerings, some of which may be offered in partnership with other parties;
>
>    - To manage and customize advertisements or promotional offers;
>
>    - For security purposes;
>
>    - For internal purposes such as auditing and data analysis.
>
> 2. To provide services that are subject to terms you have accepted, such as enforcing our licenses, agreements, and terms of service, which may include reasonable monitoring to detect and prevent misuse or fraud and to keep our games fair for all users.
>
> 3. ***To the extent you give consent***, such as when we would like to process your personal information for a purpose that would otherwise be incompatible with this policy.
>
> 4. To comply with legal obligations.

(Emphases added).[10]

### B.     PII Is Very Valuable on the Black Market

28.     The types of information compromised in the Data Breach are highly valuable to cybercriminals. The names, email addresses, passwords, security question answers, and credit and

---

[10]     *Id.*

debit card PII can all be used to gain access to a variety of existing accounts and websites and defraud Fortnite users of money and property.

29. Identity thieves can also use the PII to harm Plaintiff and the other Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[11]

30. To put it into context, the 2013 Norton Report – based on one of the largest consumer cybercrime studies ever conducted – estimated that the global price tag of cybercrime was around $113 billion at that time, with the average cost per victim being $298 dollars. That number no doubt increased after the PII of Plaintiff and the other Class members was leaked in the Data Breach.

31. The problems associated with identity theft are exacerbated by the fact that many cybercriminals will wait years before attempting to use the PII they have obtained. Indeed, in order to protect themselves, Plaintiff and the other Class members will need to remain vigilant

---

[11] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, (April 2007), *available at* http://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited August 8, 2019).

against unauthorized data use for years and decades to come.

32.     Once stolen, PII can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool) which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and PII.[12] Websites appear and disappear quickly, making it a very dynamic environment.

33.     Once someone buys PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

34.     In addition to PII, a hacked Fortnite account can be very valuable to cybercriminals because they are able to access credit or debit card information associated with the account. Once that card information is accessed, cybercriminals can and did purchase in-game Fortnite currency and other content, sold the Fortnite account and in-game purchases on the dark web and other places, like eBay, and/or used that information to make fraudulent purchases from third-parties. Sales of Fortnite accounts on the dark web have increased recently[13] with accounts selling for an average of approximately $11.29.[14] In other words, cybercriminals specifically targeted Fortnite user PII to

---

[12]     Brian Hamrick, The dark web: A trip into the underbelly of the internet (Feb. 9, 2017), *available at* https://www.wlwt.com/article/the-dark-web-a-trip-into-the-underbelly-of-the-internet/8698419 (last visited August 8, 2019).

[13]     Anthony Cuthbertson, Fortnite, Netflix and Uber Accounts Being Sold for Just £8 on the Dark Web (Feb. 19. 2019), *available at* https://www.independent.co.uk/life-style/gadgets-and-tech/news/fortnite-account-sale-dark-web-price-index-netflix-uber-cyber-crime-a8786686.html (last visited August 8, 2019).

[14]     Simon Migliano, Dark Web Market Price Index (February 2019 - UK Edition), *available at* https://www.top10vpn.com/privacy-central/privacy/dark-web-market-price-index-2019-uk-edition/#indextop (last visited August 8, 2019).

profit at the users' expense through fraud and identity theft.

35. The object of the Data Breach was not only to access and obtain user PII, but to turn around and profit from that PII through further fraud and identity theft. In other words, the hackers intentionally targeted the PII exposed, accessed, and stolen in the Data Breach in order to commit further fraud and identity theft.

### C. Epic Games' Inadequate Data Security Allowed the Breach of Fortnite User Accounts

36. On January 16, 2019, Epic Games acknowledged that Check Point "made [Epic Games] aware of vulnerabilities."[15]

37. Epic Games claimed that the vulnerabilities "were soon addressed."[16]

38. However, Epic Games did not know the origin or identity of the hackers. In fact, Epic Games had not fully assessed the scope of the attack – even though it represented that the vulnerability was fixed.[17]

39. Between November 2018 and January 2019, Plaintiff's debit card associated with his Epic Games account was, fraudulently and without his permission, charged for in-game Fortnite purchases as a result of the Data Breach.

40. Following his discovery of the fraudulent charges, Plaintiff expended many hours over the course of several months attempting to remediate the damages he suffered as a result of the fraudulent charges and to otherwise protect his PII exposed and stolen as a result of the Data Breach.

41. Unfortunately, despite numerous lapses in its approach to data security, Epic Games still lacks the safeguards and protections for Fortnite users' PII, and that information remains at risk today and into the future, until Epic Games is compelled to secure the PII stored on millions

---

[15]     Jonathan Vanian, Researchers Discover Big Cybersecurity Flaw in Fortnite (Jan. 16, 2019), *available at* http://fortune.com/2019/01/16/fortnite-security-flaw-checkpoint/ (last visited August 8, 2019).

[16]     *Id.*

[17]     Lily Hay Newman, A *Fortnite* Vulnerability Exposed Accounts To Takeover (Jan. 16, 2019), *available at* https://www.wired.com/story/fortnite-vulnerability-account-takeover/ (last visited August 8, 2019).

of United States citizens who play Fortnite.

## CLASS ACTION ALLEGATIONS

42.     Pursuant to Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of himself and as a class action on behalf of the following Class and Sub-Class:

> **Nationwide Class**: All persons who registered for Epic Games accounts in the United States and whose PII was accessed, compromised, or stolen from Epic Games in the Data Breach and whose Epic Games accounts were subject to the terms of the Applicable EULA as defined *infra*.

> **Missouri Sub-Class**: All residents of Missouri who registered for Epic Games accounts and whose PII was accessed, compromised, or stolen from Epic Games in the Data Breach and whose Epic Games accounts were subject to the terms of the Applicable EULA as defined *infra*.

43.     Excluded from the Class are Defendant and any entities in which Defendant or its subsidiaries or affiliates have a controlling interest, and Defendant's officers, agents, and employees. Also excluded from the Class are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family. Plaintiff reserves the right to amend the Class and Sub-Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

44.     **Numerosity:** The members of each Class are so numerous that joinder of all members of any Class would be impracticable. Plaintiff reasonably believes that Class members number hundreds of millions of people or more in the aggregate and well over 1,000 in the smallest of the classes. The names and addresses of Class members are identifiable through documents maintained by Defendant.

45.     **Commonality and Predominance**: This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

a.     Whether Defendant represented to the Class that it would safeguard Class members' PII;

11

b.      Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.      Whether Defendant breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

d.      Whether Class members' PII was accessed, compromised, or stolen in the Data Breach;

e.      Whether Defendant knew about the Data Breach before it was announced to the public and failed to timely notify the public of the Data Breach;

f.      Whether Defendant's conduct was an unlawful or unfair business practice under N.C. Gen. Stat § 71-1.1;

g.      Whether Defendant failed to provide timely notice of the Data Breach in violation of N.C. Gen. Stat § 75-65;

h.      Whether Defendant's violation of § 75-65 allowed for a private right of action under N.C. Gen. Stat § 71-1.1;

i.      Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, injunctive relief and restitution; and

j.      Whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

46.      As further indication of the common questions of law, Epic Games' Fortnite End User License Agreement in effect at the time of the Data Breach (the "Applicable EULA") provides that "any dispute will be resolved in accordance with the laws of North Carolina." A copy of the Applicable EULA is attached hereto as "Exhibit A."

47.      Sometime between approximately February 7, 2019, the last time counsel for Plaintiff accessed the Applicable EULA, and approximately June 24, 2019, Epic Games modified the terms of the Applicable EULA into a new EULA (the "Current EULA"), attached hereto as "Exhibit B." One such modification was the Applicable EULA's section entitled "Class Action Waiver" changing to "Binding Individual Arbitration; Class Action Waiver" in the Current EULA. As described *supra*, the Class and Sub-Class only encompass persons whose Epic Games accounts were subject to the terms of the Applicable EULA.

48.      Similar or identical statutory and common law violations, business practices,

and injuries are involved. Individual questions, if any, pale by comparison, in both quantity and quality, to the numerous common questions that dominate this action.

49.     **Typicality:** Plaintiff's claims are typical of the claims of the other members of their respective classes because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and of all other Class members arise from the same operative facts and are based on the same legal theories.

50.     **Adequacy of Representation:** Plaintiff is an adequate representative of the classes because his interests do not conflict with the interests of the other Class members they seek to represent; he has retained counsel competent and experienced in complex class action litigation; and he will prosecute this action vigorously.  The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

51.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiff and the other members of his respective classes are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

52.     Further, Defendant has acted or refused to act on grounds generally applicable

to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

53.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

      a.      Whether Class members' PII was accessed, compromised, or stolen in the Data Breach;

      b.      Whether (and when) Defendant knew about any security vulnerabilities that led to the Data Breach before they were announced to the public and whether Defendant failed to timely notify the public of those vulnerabilities and the Data Breach;

      c.      Whether Defendant's conduct was an unlawful or unfair business practice under N.C. Gen. Stat § 71-1.1;

      d.      Whether Defendant's representations that it would secure and protect the PII of Plaintiff and members of the classes were facts that reasonable persons could be expected to rely upon when deciding whether to use Defendant's services;

      e.      Whether Defendant misrepresented the safety of its many systems and services, specifically the security thereof, and its ability to safely store Plaintiff's and the other Class members' PII;

      f.      Whether Defendant concealed crucial information about its inadequate data security measures from Plaintiff and the Class;

      g.      Whether Defendant knew or should have known that it did not employ reasonable measures to keep Plaintiff's and the other Class members' PII secure and prevent the loss or misuse of that information;

      h.      Whether Defendant failed to implement and maintain reasonable security procedures and practices for Plaintiff's and the other Class members' PII in violation of N.C. Gen. Stat § 71-1.1;

      i.      Whether Defendant failed to provide timely notice of the Data Breach in violation of N.C. Gen. Stat § 75-65;

      j.      Whether Defendant owed a duty to Plaintiff and the Class to safeguard their PII and to implement adequate data security measures, and whether Defendant

breached that duty;

k.      Whether Defendant's representations were false with regard to storing and safeguarding Plaintiff and the other Class members' PII; and

l.      Whether Defendant's representations were material with regard to storing and safeguarding Plaintiff and the other Class members' PII.

## CLAIMS ALLEGED ON BEHALF OF ALL CLASSES

### First Claim for Relief
### Violation of N.C. Gen. Stat. § 75-1.1

54.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

55.     The Applicable EULA provides that "any dispute will be resolved in accordance with the laws of North Carolina."

56.     By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of § 75-1.1. The conduct alleged herein affects "commerce" within the meaning of § 75-1.1.

57.     Epic Games represented that it would utilize sufficient data security protocols and mechanisms to protect Fortnite users' PII.

58.     Defendant stored the PII of Plaintiff and members of his respective classes in its electronic and consumer information databases. Defendant falsely represented to Plaintiff and the other Class members that the PII databases were secure. Defendant knew or should have known that it did not employ reasonable industry standards and appropriate security measures that would have kept Plaintiff's and the other Class members' PII secure and prevented the loss or misuse of their PII, yet it failed to disclose that information to Plaintiff and the other Class members.

59.     Even without Defendant's misrepresentations, Plaintiff and the other Class members were entitled to and did assume that Defendant would take appropriate measures to keep their PII safe. At no time did Defendant disclose that Plaintiff's PII was vulnerable to hackers because its data security measures were inadequate. Such material information was only in the

possession of Defendant, which it had a duty to disclose. Defendant violated § 75-1.1 by misrepresenting – by affirmative conduct and by omission – the safety of its many systems and services, specifically the security thereof, and its ability to safely store Plaintiff's and the other Class members' PII. Defendant also violated § 75-1.1 by failing to implement reasonable and appropriate security measures or follow industry standards for data security – and failing to comply with its own posted privacy policies. If Defendant had complied with these legal requirements, Plaintiff and the other Class members would not have suffered the damages described herein. Defendant also violated § 75-1.1 by failing to notify Plaintiff and the other Class members of the Data Breach immediately following discovery of the breach. By failing to properly notify Plaintiff and the other Class members of the Data Breach, Defendant prevented them from protecting their PII from continuing exposure to hacking, getting stolen, and being used to defraud them of money or property.

60. Defendant's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of § 75-1.1.

61. Plaintiff and the other Class members suffered injury in fact and lost money or property as the result of Defendant's unlawful business practices. Had Plaintiff and the other Class members known of the flaws in Defendant's data security protocols, they would not have given Defendant their PII necessary to play the game. Plaintiff's and the other Class members' PII was taken and is in the hands of those who will use it for their pecuniary gain (to the detriment of Plaintiff and the other Class members), is being sold for value (making it clear that information is of tangible value), and is being used to defraud Plaintiff and the other Class members as a result of the Data Breach.

62. As a result of Defendant's unlawful business practices, which are violations of § 75-1.1, Plaintiff and the other Class members are entitled to restitution, disgorgement of wrongfully obtained profits, and injunctive relief.

## Second Claim for Relief
## Violation of N.C. Gen. Stat § 75-65

63.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

64.     The Applicable EULA provides that "any dispute will be resolved in accordance with the laws of North Carolina."

65.     Defendant stored the PII of Plaintiff and the other members of his respective classes in its electronic and consumer information databases

66.      Defendant violated § 75-65 by failing to notify Plaintiff and the other Class members of the Data Breach immediately following discovery of the breach. By failing to properly notify Plaintiff and the other Class members of the Data Breach, their PII was subject to continuing exposure to hacking, stolen, and used to defraud them of money or property.

67.     Defendant's actions and inactions as alleged herein were unlawful and in violation of § 75-65.

68.     Violation of § 75-65 constitutes a violation of § 71-1.1 where, as here, the violation causes injury.

69.     Plaintiff and the other Class members suffered injury in fact and lost money or property as the result of Defendant's actions and inactions. Plaintiff's and the other Class members' PII was taken and is in the hands of those who will use it for their pecuniary gain (to the detriment of Plaintiff and the other Class members), is being sold for value (making it clear that information is of tangible value), and is being used to defraud Plaintiff and the other Class members as a result of the Data Breach.

70.     As a result of Defendant's actions and inactions, which are violations of §§ 71-1.1 and 75-65, Plaintiff and the other Class members are entitled to restitution, disgorgement of wrongfully obtained profits, and injunctive relief.

**Third Claim for Relief**
**Negligence**

71.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

72.     Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their PII and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, *inter alia*, designing, maintaining, and testing Defendant's security systems to ensure that the PII of Plaintiff and the Class was adequately secured and protected, including using encryption technologies. Defendant further had a duty to implement processes that could detect a breach of its security system in a timely manner.

73.     Defendant knew that the PII of Plaintiff and the Class was personal and sensitive information that is valuable to identity thieves and other criminals. Defendant also knew of the serious harms that could happen if the PII of Plaintiff and the Class was wrongfully disclosed, that disclosure was not fixed, and/or Plaintiff and the Class were not told about the disclosure in a timely manner.

74.     By entrusting Defendant to safeguard their PII, Plaintiff and the Class had a special relationship with Defendant. Plaintiff and the Class signed up for Defendant's services and agreed to provide their PII with the understanding that Defendant would take appropriate measures to protect it, and would inform Plaintiff and the Class of any breaches or other security concerns that might call for action by Plaintiff and the Class. But Defendant did not. Defendant not only knew that its data security was inadequate, it also knew it did not have the tools to detect and document intrusions or exfiltration of PII. Defendant is morally culpable, given its repeated security breaches, wholly inadequate safeguards, and refusal to notify Plaintiff and the Class of breaches or security vulnerabilities.

75.     Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII by failing to adopt, implement, and maintain

adequate security measures to safeguard that information, despite repeated failures and intrusions, and allowing unauthorized access to their PII.

76.     Defendant's failure to comply with industry standards and federal and state regulations further evidences its negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII.

77.     Defendant's breaches of these duties were not merely isolated incidents or small mishaps. Rather, the breaches of the duties set forth above resulted from a long-term company-wide refusal by Defendant to acknowledge and correct serious and ongoing data security problems.

78.     But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been compromised, stolen, and/or viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the PII of Plaintiff and the Class and all their resulting damages.

79.     The injury and harm suffered by Plaintiff and the other Class members was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class members' PII. Defendant knew its systems and technologies for processing and securing the PII of Plaintiff and the Class had numerous security vulnerabilities.

80.     As a result of this misconduct by Defendant, the PII of Plaintiff and the Class was compromised, placing them at a greater risk of identity theft or subjecting them to identity theft, and their PII was disclosed to third parties without their consent. Plaintiff and the other Class members also suffered diminution in value of their PII in that it is now easily available to hackers on the dark web. Plaintiff and the Class have also suffered consequential out-of-pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

81.     Defendant's misconduct as alleged herein is fraudulent, malicious and oppressive and was conduct carried on by Defendant with a willful, wanton, or conscious disregard of the rights or safety of Plaintiff and the Class.  That despicable conduct has subjected Plaintiff and the

Class to cruel and unjust hardship in willful, wanton, or conscious disregard of their rights. As a result, Plaintiff and the Class are entitled to punitive damages against Defendant.

<strong><u>Fourth Claim for Relief</u></strong><br><strong>Breach of Implied Contract</strong>

82.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

83.     Epic Games solicited and invited Plaintiff and the other Class members to use its services. Plaintiff and the other Class members accepted Epic Games' offer and created Fortnite user accounts requiring the provision of PII to Epic Games during the period of the Data Breach.

84.     When Plaintiff and the other Class members used Epic Games services and products, they provided their PII. In so doing, Plaintiff and the other Class members entered into implied contracts with Epic Games pursuant to which it agreed to safeguard and protect their PII.

85.     Each use of an Epic Games service or product made by Plaintiff and the other Class members was made pursuant to the mutually agreed-upon implied contract with Epic Games under which it agreed to safeguard and protect their PII.

86.     Plaintiff and the other Class members would not have provided and entrusted their PII to Epic Games in the absence of the implied contract between them and Epic Games.

87.     Plaintiff and the other Class members fully performed their obligations under the implied contracts with Epic Games.

88.     Epic Games breached the implied contracts it made with Plaintiff and the other Class members by failing to safeguard and protect their PII.

89.     As a direct and proximate result of Epic Games' breaches of the implied contracts between it and Plaintiff and the other Class members, Plaintiff and the other Class members sustained actual losses and damages as described in detail above.

## ADDITIONAL CLAIM ALLEGED ON BEHALF OF THE MISSOURI SUB-CLASS ONLY

### Fifth Claim for Relief
### Violation of Missouri Merchandising Practices Act
### (Mo. Rev. Stat § 407.010, *et seq.*)

90. Plaintiff hereby repeats, realleges, and incorporates by reference each and every allegation contained above as though the same were fully set forth herein.

91. Plaintiff brings this claim on behalf of himself and the Missouri Sub-Class who are all residents of Missouri.

92. Epic Games is a "person" as defined by Mo. Rev. Stat. § 407.010(5). Plaintiff and Missouri Sub-Class members are actual consumers of the products and services offered by Epic Games.

93. Epic Games, operating in Missouri, engaged in deceptive, unfair, and unlawful trade acts or practices in the course of its business, vocation or occupation, in violation of Mo. Rev. Stat. § 407.020, including, but not limited to, the following:

    a.    Knowingly misrepresenting and fraudulently advertising material facts pertaining to its products and services to the Missouri Sub-Class by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Missouri Sub-Class members' PII from unauthorized disclosure, release, data breaches, and theft;

    b.    Knowingly misrepresenting material facts pertaining to its products and services to the Missouri Sub-Class by representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Missouri Sub-Class members' PII;

    c.    Knowingly omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Missouri Sub-Class members' PII (intending to induce others to enter into a transaction);

    d.    Engaging in unlawful practices by failing to maintain the privacy and security of Missouri Sub-Class members' PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach; and

    e.    Engaging in unlawful practices by failing to disclose the Data Breach to Missouri Sub-Class members in a timely and accurate manner, in violation of Mo. Rev. Stat. § 407.1500.

21

94.     Under Mo. Rev. Stat. § 407.1500, Epic Games "maintains or possesses records or data containing personal information of residents of Missouri" and thus is required to "notify the owner or licensee of the information of any breach of security immediately following discovery of the breach." Epic Games failed to immediately notify affected users of the Data Breach.

95.     Epic Games' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Epic Games' data security and ability to protect the confidentiality of consumers' PII.

96.     Epic Games intended to mislead Plaintiff and the other Missouri Sub-Class members and induce them to rely on its misrepresentations and omissions.

97.     Had Plaintiff and the other Missouri Sub-Class members known that Defendant failed to employ necessary and adequate protection of their personal information, they would not have created an Epic Games or Fortnite account or limited the PII they shared with Epic Games.

98.     Epic Games engaged in the above unfair and deceptive acts or practices in the course of its business.

99.     Epic Games engaged in the above unfair and deceptive acts or practices with malice and/or willfulness.

100.     As a direct and proximate result of Epic Games' unfair and deceptive practices, Missouri Sub-Class members suffered injuries to legally protected interests, including their legally protected interest in the confidentiality and privacy of their personal information.

101.     The above unfair and deceptive practices and acts by Epic Games were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and the other Missouri Sub-Class members that they could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

102.     Epic Games knew or should have known that its computer systems and data security practices were inadequate to safeguard Missouri Sub-Class members' PII and thus, that risk of a data breach or theft was high. Epic Games' actions in engaging in the above-named unfair practices

and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Missouri Sub-Class.

103.    Plaintiff and the other Missouri Sub-Class members seek relief under Mo. Rev. Stat. §§ 407.010, *et seq.*, including, but not limited to, compensatory damages, punitive damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class and Sub-Class members, respectfully request that this Court enter an Order:

a.      Certifying the United States Class and the Missouri Sub-Class, and appointing Plaintiff as Class and Sub-Class Representative;

b.      Enjoining Defendant from engaging in further negligent, deceptive, unfair, and unlawful business practices as alleged herein;

c.      Awarding Plaintiff and the other Class and Sub-Class members actual, compensatory, and consequential damages;

d.      Awarding Plaintiff and the other Class and Sub-Class members statutory damages and penalties, as allowed by law;

e.      Awarding Plaintiff and the other Class and Sub-Class members restitution and disgorgement;

f.      Requiring Defendant to provide appropriate credit monitoring services to Plaintiff and the other Class and Sub-Class members;

g.      Awarding Plaintiff and the other Class and Sub-Class members punitive damages;

h.      Awarding Plaintiff and the other Class and Sub-Class members pre-judgment and post-judgment interest;

i.      Awarding Plaintiff and the other Class and Sub-Class members reasonable attorneys' fees, costs and expenses, and;

j.      Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial of all claims in this Class Action Complaint so triable.

DATED:  August 8, 2019                    Respectfully submitted,


> */s/ Ivy T. Ngo*_____
> Ivy T. Ngo
> Alexander F. Beale
> **FRANKLIN D. AZAR & ASSOCIATES, P.C.**
> 14426 E. Evans Avenue
> Aurora, CO  80014
> Telephone: (303)757-3300
> Facsimile:  (720) 213-5131
> Email: ngoi@fdazar.com
> Email: bealea@fdazar.com
>
> *Counsel for Plaintiff*
>
> Martha Geer
> N.C. Bar No. 13972
> Adam Langino
> N.C. Bar No. 54438
> **COHEN MILSTEIN SELLERS & TOLL PLLC**
> 150 Fayetteville Street, Suite 980
> Raleigh, NC 27601
> Telephone: (919) 890-0560
> Facsimile: (919) 890-0567
> Email: mgeer@cohenmilstein.com
> Email: alangino@cohenmilstein.com
>
> *Local Rule 83.1(d) Counsel for Plaintiff*